Whitakee, Judge,
delivered the opinion of the court:
Congress has referred to us a bill (H.K. 5543, 84th Congress) directing the Secretary of the Treasury to pay plaintiff the sum of $190,716.83, in settlement of its claim for premium payments on lead and zinc ores produced under the premium price plan during November 1, 1943 to January 1, 1947. We are asked to report the amount legally or equitably due the plaintiff. It now admits it has no legal claim, which leaves only the question whether in equity and good conscience the defendant should pay it anything and, if so, how much.
In plaintiff’s petition in this court its claim is reduced to $89,837.29, and in its brief it is further reduced to $46,597.42. We are of opinion it has no claim at all, either at law or in equity and good conscience.
Plaintiff’s claim is based on the Emergency Price Control Act of 1942. A part of the purpose of this Act was to promote increased production of materials necessary to the prosecution of the war. Ceiling prices on all such commodities were fixed by the Office of Price Administration (OPA). On lead the ceiling price was 6.5 cents a pound, and on zinc, 8.25 cents a pound. But, in order to spur production of these commodities, the defendant offered to pay a premium of 2.75 cents a pound for all lead and zinc produced above the quota established for the particular producer. A producer’s quota was his 1941 production, or such lesser or *642 greater quantity as be could reasonably be expected to produce at the established ceiling prices.
These quotas were fixed by Quota Committees under established rules and regulations. They were known as “A” quotas, and, once fixed, they remained the same. However, the Quota Committees were also authorized to fix “B” quotas for lead and zinc and, in addition, a “C” quota for zinc. An additional premium of 2.75 cents a pound was paid for all production over the “B” quota, and a still additional 2.75 cents for production over the “C” quota. While “A” quotas remained constant, “B” and “C” quotas could be increased or decreased or revoked on 30 days’ notice.
Plaintiff mined and milled lead and zinc from old surface dumps owned by the Valle Mining Company near DeSoto, Missouri, about 35 miles south of St. Louis. A lease was secured on the mine dumps and a mill was purchased and dismantled and erected again about 3 miles from the mine dumps by a partnership, later incorporated as the DeSoto Lead and Zinc Company. From July 1943 to October 1944 operations were carried on by the partnership and a subsidiary corporation, which did the milling. In October 1944, plaintiff corporation succeeded to both the mining and milling business.
Plaintiff’s predecessor was assigned an “A” quota of zero, and, hence, was paid premium prices of 2.75 cents a pound over the ceiling price for all lead and zinc produced by it. In July 1945 the corporation applied for an increase in its quota, and was given a “B” quota, based on zero production, for its lead production. Thereafter, it was paid 5.5 cents a pound above the ceiling price. It was also assigned a “B” quota for its zinc production, but this was based on a production requirement of 70 tons a month, so that it got the additional' 2.75 cents a pound for only the tonnage produced in excess of 70 tons a month.
Plaintiff did not produce more than 70 tons of zinc a month and, hence, got no benefit from the assignment of the “B” quota for zinc. Plaintiff did not protest the assignment of this quota, and made no later application for a revision of it.
Plaintiff was required to make monthly reports of its operations, so that the Quota Committee might make adjust *643 ments in its “B” quotas, but no report was filed by it for July, August, September and October, and not until November 23, 1945. This report covered operations for July through October. It showed a profit from operations for these four months of $6,013.26 before depreciation;
No further reports were filed by plaintiff, although it was repeatedly requested to do so, nor did plaintiff make any further request for a revision of its “B” quotas. Hence, there was no basis for a revision of them.
Plaintiff has been paid all it is entitled to under the law and the quotas assigned to it. It could not complain of its quota for the production of lead, for that was zero, and plaintiff got the “A” premium and also the “B” premium for all lead produced. ' It did not complain of its “B” quota for zinc, nor furnish any basis upon which the Quota Committee might have revised it bn its own motion.
There is no equity in plaintiff’s claim.
It may be that plaintiff lost money from its operations, but this is immaterial. The Act under which plaintiff claims did not guarantee operators against loss; it gave them a premium price for production above what would reasonably be expected, and that is all.
If plaintiff did sustain a loss from operations, it is far from clear that this was due to improper quotas, assuming, quite contrary to the evidence, that the quotas were improper. Plaintiff’s loss, if any, was due to indifferent management and lack of adequate capital to provide necessary equipment. All of plaintiff’s officers lived in Joplin, Missouri, which was 290 miles from the site of operations. They rarely visited the site, but left all operations in the hands of a superintendent, who worked for a salary, which was not regularly paid. For months at a time there were no operations at all. There was no mining from February 16, 1945 to June 19,1945, and none from December 18,1945, to February 4,1946. The mill did not operate from March to June 1945, nor during March 1946.
Plaintiff ceased operations in January 1947. Daniel R. Lee acquired all the stock of the other stockholders'and is now the sole stockholder. On January 17, 1948, all of the corporation’s assets, except this claim, were sold to the *644 Fredericktown Lead Company for $20,000, which, was $9,-716.21 over their depreciated book value.
We are of opinion that, based on the findings of fact, which follow, plaintiff has no legal claim against defendant, nor any claim which in equity and good conscience the defendant should recognize. The trial commissioner to whom this case was referred is also of this opinion, for the reasons set out in his opinion, which is transmitted herewith.
This opinion, together with the findings of fact and also the opinion of Trial Commissioner Marion T. Bennett, which follow, will be certified to the Congress pursuant to House Resolution 208, 84th Congress.
OPINION OP THE COMMISSIONER
This case is before the court by reference pursuant to House Resolution 208, passed by the Congress on June 17, 1955, and reading as follows:
Resolved, That the bill (H. R. 5543) entitled “A bill for the relief of DeSoto Lead and Zinc Company,” together with all accompanying papers, is hereby referred to the Unted States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
H. R. 5543 would authorize the payment to plaintiff of $190,716.83 in settlement of its claim for production of lead and zinc under the Premium Price Plan authorized and administered under the Emergency Price Control Act of January 30,1942 (56 Stat. 23).[1]
*645 The sum of $89,837.29 claimed in the petition represents the difference in the total premium payments actually received by the plaintiff and the total premium payments which plaintiff contends that it was eligible to receive under the rules of the Quota Committee.
The Emergency Price Control Act of 1942 contained a declaration of policy to stabilize wages and prices. Under the Premium Price Plan for copper, lead, and zinc, ceiling prices were maintained. However, in order to stimulate the maximum production for wartime demands, premium payments were made on the excess production over 1941 normal production and on production from new mines and marginal producers. Normal 1941 production, except in special cases where a greater or lesser quantity could reasonably be expected to be produced at the established ceiling prices, was considered as the basic production of a producer on which no premium prices would be paid. This basic production was known as the producer’s “quota.” Thereafter, a Quota Committee was established to determine the quota for each producer.
The multiple-price plan was developed by the Office of Price Administration (OPA) and agreed upon with the Office of Production Management (OPM), the Keconstruc *646 tion Finance Corporation (RFC) and the Supply, Priorities and Allocation Board. Ceiling prices were established at 12 cents a pound for copper, 6.5 cents a pound for lead, and 8.25 cents a pound for zinc. Maximum differentials of 5 cents for copper and 2.75 cents a pound for lead and zinc were decided upon as additional subsidies on all production above quota assignments. The plaintiff produced no copper.
On January 12, 1942, the Federal Loan Administrator, Jesse H. Jones, wrote the OPA and OPM that Metals Reserve Company of RFC would pay 17 cents a pound for copper, 9.25 cents for lead and 11 cents for zinc for all production above quota assignments to be fixed with the approval of RFC, thus allowing the maximum price differentials on such production. On February 9, 1942, a joint statement was issued by OPA and the War Production Board announcing rules and regulations whereby domestic mine operators might obtain the premium prices for overquota production and that premiums would apply on all overquota production from February 1, 1942, regardless of when the tonnage quota was determined and announced.
On March 7,1942, the Metals Reserve Company announced that various smelting companies throughout the United States had been designated as its agents to obtain from producers their sworn statements of monthly production in excess of their quotas and other data upon which premium payments would be made.
The Metals Reserve Company on March 5,1943, announced a program for additional premium payments to insure the maximum necessary production, whereby the Quota Committee was authorized to issue and assign “B” quotas for the production of lead and zinc. Under this program the Metals Reserve Company continued to pay the premium price over the OPA ceiling of 2.75 cents a pound for production over “A” quotas, plus a like amount for production over “B” quotas for lead and zinc and an additional 2.75 cents a pound for zinc produced in excess of “C” quotas and thereby established maximum prices of 12 cents a pound for lead and 16.5 cents a pound for zinc on that portion of production in excess of the respective quota assignments.
*647 The Premium Price Plan was published and producers were furnished the rules and regulations under which it was administered. Assignments by the Quota Committee were made only upon application and became effective upon the first day of the month in which application was made. Initial quotas, once established, were not increased but production assignments under “B” and “C” quotas could be increased or decreased by the Quota Committee or revoked upon 30 days’ notice. Upward revisions of quota production were recommended by the Quota Committee when operators’ reports were in default or when it appeared that excessive premiums would be paid. The regulations required that deficit quota production, other than zero quotas, for any month would have to be made up by production in later months before the premium payments on overquota production could be resumed. Quota revisions were based primarily on forecasts of operations and for future production and no allowance coiild be made for past losses.
The Quota Committee furnished forms for submitting applications for premium pay which specified the data required. After considering the data submitted on the operator’s past history and its projected operating costs, the Quota Committee made modifications according to its best judgment and compiled an approved production-cost-revenue schedule of the mine. To compensate operators for depreciation, taxes, depletion, interest on investments and other indirect expense, a formula was developed for copper-lead-zinc mines to provide a “margin” as an addition to the more <■ direct operating costs. This formula was based upon information derived from financial records of many representative mines previous to 1942 and was adjusted to allow the greatest margin factor to the smallest operator. The basic formula was applied to producers who processed 5,000 tons or more per month of crude ore with a sliding scale of increases for operators who produced lesser quantities.
In the calculation of quotas those mines that produced metal at lower costs per pound were allowed the higher operating margins per pound.
Premium payments were computed upon the differential between the OPA ceiling price and the price established by *648 the Metals Beserve Company for which payment would be made for that part of production over quota assignments. On June 3,1946, the ceiling price for lead was increased by 1.75 cents a pound to 8.25 cents and the premium price on production over “A” quota assignments was reduced in like amount. On October 14, 1946, the ceiling price for zinc was increased from 8.25 to 9.25 cents a pound and the “A” premium production was reduced accordingly.
Effective November 1, 1946, when a free market was reestablished for lead and zinc, all existing quotas were translated into the “market price-plus-premium” type of assignment and premium payments thereafter were measured by the difference between the current market price and producer’s assigned price.
The plaintiff’s operations consisted of the mining and milling of material from old surface dumps owned by the Valle Mining Company near DeSoto, Missouri, about 35 miles south of St. Louis, from about November 1,1944 until the end of January 1947. The area covered approximately 5,155 acres of low-grade material. Tests indicated that the dumps contained approximately 2.5 percent of lead and 1.5 percent zinc.
The Valle mine dumps had been previously operated from about June 1943 until the end of October 1944 by a partnership of the same name consisting of 10 individuals who later organized the plaintiff corporation. The partnership operated approximately 560 acres of the Valle mine dumps under a sublease originally acquired from the owner by Clyde Lemons and Ralph Hatcher on July 1,1940. The operations consisted of mining material from the dumps and hauling it to the concentrating mill which was erected some 3 miles away. The end product of this operation was a mixed ore concentrate with a combined metal content of approximately 35 percent of lead and zinc.
George W. Moore had previously acquired an assignment of the Lemons and Hatcher lease and had purchased the mill, together with 172.25 acres of land in Moniteau County, Missouri, from the Ozark Smelting and Mining Company of Coffeyville, Kansas, for $15,000. The sublease and mill were assigned to the partnership by Moore and the mill was *649 dismantled, moved and erected again near the site of the Valle mine dumps. Tbe concentrates produced were sold to the Ozark Smelting and Mining Company, an agency of Metals Reserve Company. The partnership operated under the initial “A” quota assignment of zero production requirement. During the period July 1943 to October 1944 the sale of concentrates amounted to $72,282.61 and premium payments were $81,194.86.
On or about October 16, 1943, the partners organized the plaintiff corporation as the DeSoto Custom Milling Company and contracted with it to operate the concentrating mill. The partnership continued the mining of material from the dumps, the sale of ore concentrates and the collection of premium payments.
On October 16, 1944, the corporate name was changed to its present title, the partnership was dissolved and its operations merged with that of the plaintiff’s. Thereafter the plaintiff performed both the mining and milling operations at the Valle mine dumps. It continued the sale of its concentrates to the Ozark Smelting and Mining Company and collected the premium payments under the initial quota assignments.
On October 31, 1944, the plaintiff’s total invested capital was $22,546.50, represented by $3,800 for 1,900 shares of capital stock, $5,212.74 of earned surplus from its prior milling operations and $13,533.76 net assets transferred from the partnership.
In July 1945 the plaintiff applied for an increase in its premium payments and submitted data to the Quota Committee for its consideration in determining any revision that might be justified thereby. Effective July 1,1945, the plaintiff was assigned a “B” quota for its lead production with a zero base which authorized an additional 2.75 cents a pound on its entire production of lead. Plaintiff was also assigned a “B” quota for its zinc production with a base production requirement of 70 tons a month so that the additional 2.75 cents a pound was payable only on that portion of its production that exceeded the basic production.
The plaintiff had acquired a lease direct from the Valle Mining Company about August 7, 1945, covering the entire *650 area of 5,155 acres, renovated its concentrating mill and estimated a substantial increase in its forward production of concentrates.
In connection with, its application for a premium increase the plaintiff submitted monthly statements of its operations from November 1944 through July 1945 showing a loss of $20,637.96 before depreciation. This loss resulted largely from charges to operations of $17,672.42 during March to June 1945 when the mill was closed. The plaintiff also reported in its application that it made cash investments of $26,650 for exploration and development which the Quota Committee allowed for recovery by amortization during the year ended June 30, 1946, at the rate of 27 cents a ton for crude ore processed on plaintiff’s anticipated production. There is no evidence that the plaintiff made any expenditure for exploration and development work.
The plaintiff failed to meet its anticipated production of lead and zinc and did not benefit by the “B” quota for zinc because it did not exceed the basic production of 70 tons a month.
Upon the assignment of a “B” quota for its lead and zinc production the Quota Committee required that plaintiff submit to the committee monthly statements of its operations. About November 23, 1945, the plaintiff submitted monthly statements of its operations from July through October 1945 showing a profit before depreciation of $6,013.26. The plaintiff failed to submit any further reports or data to the Quota Committee despite repeated requests on the part of the committee.
Effective November 1, 1946, the plaintiff’s existing quotas were converted into assigned prices of 12 cents a pound for lead and 11.3 cents a pound for zinc on its entire production and premium payments thereafter were limited to the differential between the current market price and the assigned prices.
By reason of its failure to submit monthly operating statements or to file any further application for a revision of its quota or price assignments according to the prescribed rules and regulations of the Quota Committee, the plaintiff was not entitled to any further revision of its premium payments.
*651 The plaintiff operated the Valle mine dumps and the concentration mill from November 1, 1944 until about the end of January 1947 when all production ceased. During this period it produced concentrates which assayed metal contents of 660,224 pounds of lead and 1,760,322 pounds of zinc. Its premium payments were based upon the net metal recovery calculated at 95 percent of lead and 90 percent of the zinc assay. The plaintiff’s tonnage of crude ore mined and milled was estimated at 84,168.36 tons and was calculated upon 5 tons per truckload. On the basis of plaintiff’s estimated tonnage milled the assay of concentrates produced amounted to only .39 percent of lead and 1.05 percent of zinc. Even allowing for an approximate overestimate of about one-third for crude ore milled, the'plaintiff’s combined recovery of metal would be less than one-half of the prior tests of the materials processed.
During the period the plaintiff operated the Valle mine dumps its income amounted to $131,734.97, with total costs of $150,143.22 and a resulting loss of $18,408.25. Beceipts from the sale of ore concentrates were $67,413.55 and premium payments amounted to $64,062.70 plus $258.72 receipts from other sources. Premium payments substantially exceeded plaintiff’s proceeds from ore concentrates sold until June 1946 when the OPA ceiling price was increased by Í.75 cents a pound for lead. This increased the sale price of concentrates in proportion to the premium price, but reduced the premium payments under plaintiff’s “A” quota by the full 1.75 cents a pound. After November 1, 1946, when a free market price was established, premium payments were substantially eliminated.
The loss of $18,408.25 resulted largely by charges to operations when no production was accomplished. There was no mining and hauling of materials from February 16, 1945 until June 19, 1945, nor from December 18, 1945 until February 4, 1946. No substantial milling of concentrates was performed from March to June 1945 nor during March 1946.
Other factors that contributed to plaintiff’s loss include excessive hauling costs, inadequate equipment, lack of supervision and operating funds. The mill was located approximately 3 miles from the dumps instead of adjacent thereto. *652 The plaintiff’s hauling costs were approximately 50 cents a ton.
Some of the material contained as much, as 70 percent clay. The superintendent recommended the installation of a log washer for the elimination of clay at the dumps, but this unit was never installed because of the lack of funds. The clay retained part of the metal which could not be recovered by the type of mill used. By March 1945 the mill was in such poor condition that it could not produce a marketable concentrate, but thereafter it was overhauled.
The entire operation was run by a superintendent at the site. He was not regularly paid and by the end of July 1945 his unpaid compensation amounted to $1,500. The plaintiff’s total indebtedness at that time was $32,612.27.
George W. Moore was president of the plaintiff corporation until about October 1945 and Daniel E. Lee was president thereafter. Jack Ferneau was designated as vice president and manager and E. E. Smoot was designated as secretary-treasurer. All of them were engaged in other businesses in Joplin, Missouri, approximately 290 miles’ distance from the Valle mine operations. All of them are now deceased except Daniel E. Lee, who holds all of the capital stock of the plaintiff corporation. They were kept informed of the plaintiff’s pperations through reports of the superintendent, but it does not appear that any of them regularly visited the mill or the mining site.
After the plaintiff ceased operations in January 1947 Daniel E. Lee acquired all of the outstanding stock held by others. The Fredericktown Lead Company operated the Valle mine dumps from about May 1,1947, under an option agreement with plaintiff to purchase all of its assets and the assignment of its lease with Valle Mining Company. On January 17,1948, the plaintiff’s assets were sold to Frederick-town Lead Company for $20,000, with a resulting profit of $9,716.21 over the depreciated book values.
Daniel E. Lee, who owns all of the capital stock and brought this suit in the name of the plaintiff corporation, benefited personally to the extent of at least $5,000 by receipts over and above his investments, loans and other costs *653 in connection with plaintiff’s operations of the Yalle mine dumps and the liquidation of its assets.
During the period of operation of the Premium Price Plan from February 1,1942 to June 30,1947, the defendant paid subsidies of approximately $351,108,139 to 3,591 producers that participated in mining operations, or an average of approximately $97,774 to each of such producers. Some 583 other operators did not report their production to the Quota Committee and did not receive any premium payments. The defendant paid approximately $145,257.56 in premiums for the operation of the Valle mine dumps, which includes $81,194.86 paid to the partnership for production of lead and zinc from about July 1,1943 to October 31,1944, and $64,062.70 to the plaintiff for its operations from November 1,1944 to the end of J anuary 1947.
The overall average premium price paid to participating producers was 3.41 cents a pound for lead on 42.15 percent of domestic production as compared with 4.06 cents a pound paid to the plaintiff on 90 percent off its production, equivalent to 8.67 cents a pound on 42.15 percent of its production.
The overall average premium price paid for zinc production was 4.067 cents a pound on 57.61 percent of all domestic production as compared with 2.53 cents a pound paid to the plaintiff on 95 percent of its production, equivalent to 4.20 cents a pound on 57.61 percent of its production.
The premium price payments for production at the Yalle mine dumps not only exceeded substantially the average payments to all other producers but the average unit prices on plaintiff’s production of lead and zinc exceeded the average unit prices paid to others on the proportion of production for which payments were made. Had plaintiff submitted all monthly operating statements as required and made further application for revision of its quota or price assignments, there is still no adequate evidence before the court to indicate it would have prevailed.
For the reasons and facts stated above, it is concluded that the plaintiff was not entitled to any additional premium payments under the rules and regulations for the operation of the Premium Price Plan, nor does plaintiff have any equit *654 able claim against the United States for its production of lead and zinc at the Yalle mine dumps.
v Lakamobe, Judge/ Madden, Judge; and Jones, Chief Judge, concur.
BINDINGS OP PACT
1. The plaintiff was incorporated under the laws of the State of Missouri on October 16,1943, in the name of DeSoto Custom Milling Company and was located at Joplin, Missouri. Its authorized capital stock of $6,400 consisted of 3,200 shares at $2 per share. On or about October 16,1944, the corporate name was changed to its present title, DeSoto Lead and Zinc Company.
All of plaintiff’s outstanding capital stock of 2,200 shares[2] had been acquired by Daniel R. Lee, Fort Scott, Kansas, by the end of 1947, and has since been retained by Lee and his wife. The physical assets of the corporation and the lease under which it operated the Yalle Mining Company dumps were sold on January 17, 1948, to the Fredericktown Lead Company and plaintiff has remained inactive since that time.
2. On April 13,1955, H. R. 5543 (101 Cong. Rec. 4397) was introduced in the 84th Congress and provided:
Be it enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to DeSoto Lead and Zinc Company (a corporation), Fort Scott, Kansas, the sum of $190,716.83. Payment of such sum shall be in full settlement of all claims of said DeSoto Lead and Zinc Company, Fort Scott, Kansas, against the United States for bonus payments claimed (earned) on lead and zinc ores produced under the premium price plan of the Government during the period from November 1, 1943, to January 1, 1947, from mining operations at Yalle Mines, Missouri: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any *655 person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
The bill was referred to the Committee on the Judiciary and on the following day H. Ees. 208 (101 Cong. Eec. 4510) was introduced. This resolution referred H. E. 5548 to the Court of Claims, pursuant to sections 1492 and 2509 of title 28, United States Code, directing the court to make findings of fact and conclusions sufficient to inform Congress whether there are any sums legally or equitably due from the United States to the claimant.
The resolution was passed by the U. S. House of Eepre-sentatives on May 17,1955. Plaintiff’s petition was filed on September 19, 1955.
3. The petition asks for compensation of $89,837.29 for the production of lead and zinc by reprocessing waste materials at the Valle Mining Company dumps during the period October 1944 through January 1947 under the Premium Price Plan hereinafter reported. The Valle mines are located approximately 12 miles from DeSoto, Missouri, about 35 miles south of St. Louis, Missouri, 290 miles from Joplin, Missouri, and 305 miles east of Ft. Scott, Kansas.
PREMIUM PRICE PLAN
4. Effective February 1,1942, and continuing until June 30, 1947, there was in operation what is known as the Premium Price Plan for copper, lead and zinc. This plan was authorized and administered under the Emergency Price Control Act of January 30, 1942 (56' Stat. 23), which contained a declaration of policy to stabilize wages and prices.
Under the administration of this plan, ceiling prices were maintained, but in order to stimulate the maximum necessary production for wartime demands premium payments were made on excess production over normal 1941 production, referred to as the “quota” basic production, and on production from new mines and marginal producers. The history of •this plan and the basic documents pertaining to its creation and operation are contained in Bureau of Mines information circular 7536, United States Department of Interior, which was received in evidence as plaintiff’s exhibit 2.
*656 5. Following the outbreak of war in December 1941 the officials of the Office of Price Administration, sometimes referred to as the OPA, developed a multiple-price system for copper, lead and zinc, which was agreed upon with the Office of Production Management (OPM), the Reconstruction Finance Corporation (RFC), and the Supply, Priorities and Allocation Board. Ceiling prices were established by the OPA at 12 cents per pound for copper, 6.5 cents for lead and 8.25 cents for zinc. The maximum differential of 5 cents for copper and 2.75 cents for lead and zinc were decided upon as additions to the ceiling price as subsidies on all production above quotas calculated on the basis of 1941 production.
On January 12, 1942, Jesse H. Jones, Federal Loan Administrator, wrote the OPM and OPA that the Metals Reserve Company of RFC would pay 17 cents a pound for copper, 9.25 cents for lead and 11 cents for zinc for a period of 21/2 years from February 1, 1942, for production above the 1941 quotas to be fixed with the approval of RFC. These steps were taken under authority of section 5 (d) (3) of the Reconstruction Finance Corporation Act of 1932, as amended.
6. On February 9, 1942, a joint statement, known as the Premium Price Plan, was issued by the WPB and OPA setting forth the rules and regulations by which domestic mine operators might obtain the premium prices for over-quota production of copper, lead and zinc. The plan provided that initial quotas would be fixed by a joint committee from WPB and OPA and that premiums would apply to all overquota production from February 1, 1942, regardless of when tonnage quotas were determined and announced, at rates of 5 cents per pound for copper and 2.75 cents per pound for lead and zinc over existing OPA prices.
The regulations provided that quotas would be established for particular mines or group of mines referred to as a “property” and expressed in terms of a monthly rate of production, and that production from mine waste dumps would be considered as production from the mine or group of mines from which the dump originated. Such quotas *657 were to be established under five distinct classifications, as follows:
(a) Zero quotas would be assigned for any property having no production during 1941 or production of 200 tons or less of any metal, except as provided under (e) below. Thus, the full production from such mines would be generally entitled to the premium payments.
(b) Quotas between zero and 100 percent, except as provided in (e) below, would be established for mines that produced more than 200 tons but less than 600 tons of any metal during 1941, and such quota would be established by deducting 200 tons from the 1941 production and multiplying the remainder by 1.5. For example, a mine that produced 400 tons in 1941 would have a quota of 300 tons with a monthly rate of 25 tons (400 minus 200 times 1.5).
(c) One hundred percent quotas would apply to mines which during 1941 had produced 600 tons or more of any metal for which the assignment was determined, except as provided in (d) and (e) below. The 1941 rate of production was determinable upon the average weekly rate of actual production times 52 weeks. The rate of production would be the same as actual production except where a mine had operated less than 52 weeks during 1941. Thus, a mine of this type would be entitled to premium pay only on the increase of its production of any metal over its 1941 production of that metal.
(d) Special quotas of less than 100 percent of 1941 production might be assigned in special cases.
(e) Special quotas in excess of 100 percent of 1941 production would be assigned in certain cases, based upon the determination of tonnages that could be reasonably expected to be produced at the established OPA rates, and for mines that were not operated during 1941, but where plans were under way to provide for their operation.
In each instance where a production quota was established, the monthly rate was determinable by dividing the amount by 12. When any mine failed to maintain its monthly quota, its production deficit would have to be made up before premium payments would be made in overquota production in later months. Of course, this would not apply *658 for mines assigned a zero quota. If conditions developed that made it impossible to maintain the quota assignment, consideration would be given to applications for reductions of the quotas. But all initial quotas, once established, would not be raised during the period of the operation of the plan.
The production of a mine or property was based upon the recoverable metal contents of the materials or concentrates produced and was determined in the following manner:
(1) For materials shipped direct to custom mills, or other mills where commingling of ores prevents accurate allocation of metal contents, the metal content was determined at 86 percent of lead and 77 percent of zinc in all materials in which the assay exceeded .5 percent. Any lots which failed to exceed .5 percent were to be disregarded for premium purposes.
(2) For concentrates shipped direct to a smelter or electrolytic reduction plant, the metal content was measured at 95 percent of lead and 81 percent of zinc where the lead smelter operated in conjunction with a zinc fuming plant, and 60 percent of lead and 90 percent of zinc at a zinc smelter or electrolytic plant.
The plaintiff operated a mill near the site of the Valle Mining Company dumps for the production of lead and zinc concentrates. These concentrates were all shipped to the Ozark Smelting and Mining Company’s reduction plant at Coffeyville, Kansas, and plaintiff was paid premiums on the basis of 95 percent of the assay for lead and 90 percent of zinc.
7. On March 7, 1942, the Metals Keserve Company of the KFC issued a statement of its functions under the Premium Price Plan and method of payment to producers. It reported that various smelting companies throughout the United States had been designated as agents for Metals Reserve Company to obtain and transmit the necessary data required for making premium payments. The Metals Reserve Company, sometimes referred to as the MRC, required that a sworn statement must be furnished by each producer showing the amount of material in excess of quota delivered during the month on which he was eligible for a premium payment, and caused the smelting company to be furnished *659 with, all necessary information to enable it to supply the MEC the data required for making premium payments. Upon the receipt of such data from its agents and representatives, together with the sworn statement of the producer, the MEC would promptly arrange for the premium payments.
The Ozark Smelting and Mining Company was one of the designated agents of the MEC throughout the period involved herein.
8. Effective May 1,1942, the WPB established the Premium Price Quota Committee to administer the plan, subject to the concurrence of the Metals Eeserve Company. This committee consisted of six members and was composed of one representative each from the Copper Branch, Tin-Lead Branch, and the Zinc Branch of the Materials Division of the War Production Board, with an equal number from the corresponding organizational units of OPA. The duty of the committee was to establish and assign production quotas to copper, lead and zinc producers, and to promulgate rules and regulations and other appropriate measures to effectuate its work.
9. On March 5, 1943, the Metals Eeserve Company announced a program for additional premium payments to insure maximum necessary mine production of lead and zinc. This program was administered through the same channels as the initial plan and authorized the Quota Committee to assign “B” quotas for both lead and zinc upon which the MEC would pay an additional 2.75 cents per pound for excess production and to assign “C” quotas for zinc only, upon which it would pay a second additional 2.75 per pound for excess production over such quota assignments. This plan had been previously agreed upon between the various governmental agencies and approved by the President effective January 1, 1948. The initial premium payments were continued on excess production over established quotas thereafter designated as “A” quotas.
The “B” and “C” quotas on which additional premiums were based could be increased at any time (which would reduce the production on which premiums would be paid), or they could be revoked entirely upon 30 days’ notice. Ini *660 tial quotas, as well as any downward revision of quota assignments (to increase the production for premium pay), were made only upon application by the operators, and the effective date of the assignment, or revision of the quota, was the first day of the month in which the application was made.
This regulation provided that monthly deliveries below the respective quotas for each metal must be made up in the next succeeding month or months before the producer could receive the premium payments on production in excess of such quotas.
Under an announcement of October 27,1948 (WPB-4496), the premium prices over “B” and “C” quotas were denied to lead and zinc mines which had not commenced production up to that time and to lead and zinc mines “having a low labor productivity and located in areas in which there is serious shortage of labor.” The restriction was removed in respect to lead producers on Febniary 1, 1946, and also in respect to zinc producers on August 16, 1946.
10. On June 8,1946, the ceiling price for lead was increased 1.76 cents from 6.6 to 8.25 cents per pound, and copper was increased 2.875 cents per pound from 12 to 14.375 cents, and the premium payments on “A” quotas were reduced accordingly, lead being reduced from 2.75 to 1 cent a pound and copper from 5 cents to 2.625 cents per pound on “A” quotas.
On October 14, 1946, the OPA ceiling price on zinc was increased from 8.25 cents to 9.25 cents a pound and the premium payments on “A” quotas were reduced accordingly.
11. On August 6, 1946, the RFC announced that Public Law 548, 79th Congress, approved July 25, 1946 (60 Stat. 664), which extended the Premium Price Plan to June 30, 1947, was retroactive to June 30, 1946. Section 1 (d) of this law provided for the decontrol of nonagricultural commodity prices on or before December 31,1946, and by Executive Order 9809, issued December 12, 1946, the OPA was transferred to the Office of Temporary Controls. Wage controls had been terminated by Executive Order 9801 on November 9, 1946. The Office of Premium Price Plan was merged and became a part of the Office of War Mobilization and Reconversion, effective January 27,1947.
*661 12. On September IS, 1946, the Director of Economic Stabilization issued, directive 137 pursuant to Public Law 648, 79th Congress, which provided for premium payments for the cost of exploration and development of domestic mines for ores of copper, lead and/or zinc. To the allowance for plant ownership in lieu of depreciation in fixing operating margins there were added, effective July 1, 1946, allowances for mine plants, unless the plant had been largely amortized by premium payments.
OES directive 137 also provided, in any case where a producer would be denied the above benefits because of receiving the maximum premiums available within existing ranges, and upon application and recommendation of the Quota Committee, as follows:
(a) Any B lead quota may be specified to provide premium payments for each pound of lead of overquota production within a range between 15% cents and the sum of the ceiling price of lead and the A premiums;
(b) Any C zinc quota may be specified to provide premium payments for each pound of zinc of overquota production within a range between 17cents and the sum of the ceiling price of zinc and the A and B premiums;
Thus, whenever the ceiling price, or any price in a decontrolled market equaled or exceeded 15.75 cents a pound for lead or 17.5 cents a pound for zinc, no premium could be paid.
The regulations also provided:
Effective November 1,1946, all premium assignments were reissued with the then-existing quotas translated into the “market price-plus-premium” type of assignment. Any tonnage quotas existing against the old quota assignments remained with the new assignments.
The plaintiff’s “A” quota premiums were reduced to 1 cent a pound for lead commencing with the month of June 1946 and to 1.75 cents a pound for zinc commencing October 14, 1946, and commencing November 1,1946, all premium payments were based upon the difference in the current market price and the maximum allowable assigned price under the existing Premium Price Plan quotas.
*662 13. The Quota Committee established certain administrative principles in its operation of the Premium Price Plan in part as follows:
(1) Quota revisions are calculated to provide the financial basis for future production only.
(2) Downward quota revisions (increased rate of premium payments) are based primarily on forecasts of operations.
(3) Quota revisions for forward production shall not include allowance for the reimbursement of past losses.
(4) Recommendations for upward revision of quota (decreased rate of premium payment) are made at the discretion of the Quota Committee when operating reports are in default or when it appears that excessive premiums are being or will be paid.
(5) Downward revisions of quota are made only at the request of the applicant.
#
(9) Premiums to include allowances for exorbitant royalties are not recommended by the Quota Committee. * # * * #
(13) The lump sum allowed for operating margin in the calculation of quotas is intended to include all corporate allocations such as depreciation, depletion, other reserves, dividends, retirements to surplus, etc.
(14) In determining operating margins, basic margins are increased by 50 percent for operators owning the mines, by varying amounts for operators owning mills, and by varying amounts for small mines.
# * * # *
(16) In the calculation of quotas, higher operating margins per pound of metal are reckoned for those mines which produce metal at lower costs per pound.
On April 1,1943, the OPA issued maximum price regulation 356, which froze the royalties paid by domestic mine operators for copper, lead and zinc at the rates in effect on December 31,1942. The regulation expressly provided that no royalty would be allowed on the basis of premium or bonus money in excess of 2.75 cents per pound for lead and zinc, which was stipulated for the “A” quota premium payments. Thus, royalties could not be included as an element of cost for the payment of premiums on “B” and “C” quotas. This *663 regulation applied to overriding royalties and to royalties payable under subleases as well as prime leases.
14. The Quota Committee prescribed forms, which were furnished mine operators for the purpose of making application for premium pay. The data required and provided in these forms specified the location of the mine, type of ore deposits, reserves, grade and mining methods, the tonnage of anticipated production, operating costs, capital expenditures for equipment, mine, ownership or royalty basis, and the previous operating history of the mine, if any, covering its production-cost-revenue record. The Quota Committee, after consideration of the data submitted on the operator’s past history and anticipated operating costs, made modifications according to the best judgment of the committee and compiled an approved production-cost-revenue schedule for the mine.
To compensate operators for taxes, depreciation on mine and mill installations, depletion, interest on capital investments, etc., a formula was developed for copper-lead-zinc mines to provide a “margin” as an addition to the more direct operating costs. This formula was based upon information derived from financial records of many representative mines previous to 1942. This basic margin factor was adjusted for small mine operators to allow the greatest margin factor to the smallest operator, as follows:

OPERATIONS OF THE VALLE MININO COMPANY DUMPS
15. The plaintiff’s operations consisted of mining and milling old surface dumps of waste from prior mining operations which took place many years ago, possibly as many as 100 years before. These surface dumps covered areas of approximately 5,155 acres in Jefferson and St. Francois Counties, *664 Missouri, and contained approximately 275,000 tons of waste materials.
On July 1, 1940, Clyde Lemons and Ealph. Hatcher had entered into a lease contract with the owner for the operation of approximately 560 acres of the Yalle dumps on a royalty basis of 10 percent of the gross proceeds from the metals produced for a period of 10 years ending July 1,1950.
Under a sublease agreement of October 10, 1942, Lemons and Hatcher granted George W. Moore the exclusive license to mill and treat the material in the dumps on the surface of the same 560 acres, described in the sublease, for the remaining period of the original lease ending July 1, 1950. This sublease agreement provided for the payment of royalties by Moore to Lemons and Hatcher at 22.5 percent of the gross current market value of the minerals recovered before deductions of freight charges, such market value to include all bonuses or premiums received unless expressly prohibited by law or valid rule of a governmental agency. The said 22.5 percent included the 10 percent royalty to the fee owner under the underlying lease held by Lemons and Hatcher. Moore agreed immediately to erect a mill or concentrating plant of not less than 150 tons daily capacity, to perform the milling of the waste material in good faith continuously, and to pay $800 a month as advanced royalty commencing October 20, 1942, until the mill was completed and in operation.
16. On January 7, 1943, George W. Moore of Joplin, Missouri, entered into an agreement with the Ozark Smelting and Mining Company of Coffeyville, Kansas, referred to hereinafter as Ozark, whereby Ozark agreed to sell to Moore its concentrating mill, machinery and equipment, including one Bucyrus Erie Model 10B gasoline driven shovel, and 172.25 acres of land, all located in Moniteau County, Missouri, for the sum of $15,000, there being no evaluations separately for the land and the mill and equipment. Moore agreed to dismantle the mill immediately, move the mill and equipment to the subleased dumps at the Yalle mines and be ready for operations there within 90 days, and to produce as much zinc ore as possible by reasonably diligent effort and to sell to Ozark all zinc concentrates having a' zinc content of not *665 less than 35 percent of metal, or as much, as Ozark might require, at 2 cents per pound of the metallic content, f. o. b. cars at its Coffeyville plant, some 65 miles west of Joplin. Moore agreed to ship at least 3,000 tons of concentrates to Ozark, from which Ozark was authorized to deduct $5 a ton to cover the price of the mill and land, except that in event a better price could be obtained by Moore from others, then payment of $5 a ton to Ozark would be made from such sales until the $15,000 was paid in full within a period of 18 months.
Ozark was secured by a deed of trust on the land by Moore, a chattel mortgage on the mill and equipment with an insurance policy on the same, and the assignment of the sublease to the Valle mine dumps from Lemons and Hatcher deposited in escrow.
17. On April 15, 1943, Moore and nine others organized a partnership for the purpose of operating the sublease of the 560 acres of the Valle mine dumps. Moore assigned to the partnership the sublease, plant and equipment, subject to the chattel mortgage and assignment in escrow of the sublease to the Ozark Smelting and Mining Company of January 7, 1943. The assignment and partnership agreement states that “each of the parties hereto has contributed in cash and/or property or performed services in the erection of said lead and zinc concentrating mill and for the acquisition of equipment, tools, appliances and hauling,” and was assigned the following interests in the partnership:

The partnership operated the lease and the reduction plant for the production of lead and zinc concentrates until about November 1, 1943. In August 1943 the members of the partnership decided to organize the DeSoto Custom Milling *666 Company, a corporation. The partnership continued to mine or excavate and haul the materials to the mill, to sell the concentrates produced and to collect the proceeds of the sales and the premium prices from the Metals Reserve Company on the mining operations. The corporation, DeSoto Custom Milling Company, operated the mill under a contract with the partnership, and was paid by the partnership for such services.
18. The DeSoto Custom Milling Company operated at a profit under its milling contract with the partnership, whereas the partnership reportedly lost money in operating the mining lease, although the operating record of the partnership has not been furnished in evidence. Since the partners also owned the corporation, it became desirable to dissolve the partnership and merge the operations of both the mining and hauling of materials as well as the milling of the materials into concentrates.
By an assignment of October 5, 1944, the partnership transferred the mining sublease of 560 acres of dumps to the DeSoto Lead and Zinc Company, a corporation, although its name had not been changed to this title until October 16, 1944. The assets and liabilities of the partnership were transferred to the corporation October 31,1944, and the plaintiff corporation thereafter operated both as a mining and milling company. The plaintiff claims mining operations by the corporation from the beginning of October 1944 although operating statements for that month show that the partnership operated the mining dumps until the end of October 1944 and received proceeds of sales and the premium payments from such operations.
19. The ownership of the capital stock of the plaintiff corporation was in the same proportions as the respective interests of partners in the partnership, except the 2%4 interests owned by Reynolds, Raymond and Lemons, During the operation of the partnership, their interests had been eliminated and only the remaining partners executed the assignment of the sublease to the plaintiff corporation.
The remaining partners, holding 3%4 of the partnership interests, had acquired the same proportion of capital stock of the corporation and, on October 31,1944, when the partnership was dissolved and the corporation took over the *667 entire operations, its outstanding capital stock was s%4 of its authorized capital stock of $6,400, or $3,800 represented by 1,900 shares at $2 a share.
During 1945, 100 shares were issued to George Little, a member of an accounting firm which kept plaintiff’s books from January 1944 until November 1947, and he was paid part of his salary in cash. An additional 100 shares were issued in 1945 to Caresio, making 2,100 shares outstanding for the remainder of the period of active operations.
In the interim, the 400 shares which Moore was entitled to, by reason of his %4 interest in the partnership, were transferred to others. Little acquired 250 additional shares and Beasley acquired 150 additional shares. J. A. Worley, who was superintendent of plaintiff’s mining and milling operations from March 1945 to January 1947, was thereafter issued 100 shares of capital stock in lieu of unpaid salary earned.
Daniel B. Lee was issued 500 shares of stock in the corporation, having a paid-in value of $2 a share, which was equivalent to his 1%4 interest in the partnership. After the plaintiff’s active operation of the mining sublease was discontinued Lee acquired all of the remaining outstanding shares, at a total cost of approximately $8,375.
20. By October 31, 1944, when the partnership assets and liabilities were consolidated with those of the plaintiff, the plaintiff’s total capitalization consisted of $3,800 paid-in capital, $5,212.74 of earned surplus from prior milling operations, and $13,533.76 paid-in surplus, represented by the following items:

*668 PREMIUM PAYMENT BASES
21. The partnership that operated the Valle mine dumps up to October 1944 had received premium payments under an “A” quota with zero base. That is, it was paid a premium of 2.75 cents a pound for its entire output of lead and zinc, measured at 95 percent of metallic lead and 90 percent of the metallic zinc in the assay of ore concentrates delivered to the smelter. The premium payments constituted approximately 50 percent of the total mining income.
In July 1945 the plaintiff requested an increase in its premium payments and on August 18,1945, wrote the executive secretary of the Quota Committee in part:
Due to unprofitable operations for some time past, we have felt the need for a revision upward of our “A” Bonus, but were reluctant to apply as we had, until August 7th, been operating under a sub-lease and high royalty. However, on that date, we have extinguished the Lemons and Hatcher sub-lease and had a still further revision downward from 10% to 5% by the landowner, who has seen the necessity for cooperating with us in order to assure the operation of the property.
There was submitted with this letter an application for revision of quotas (Form WPB-2465) containing certain data requirements and a statement of plaintiff’s operations of the Valle mine dumps for the 9 months ended July 81, 1945, showing a loss before depreciation of $23,586.27. The application form contained estimated proven reserves of 390,000 tons with 1 percent of lead and 5 percent of zinc, with an estimated production of concentrates of 60 tons of 76 percent lead and 300 tons of 30 percent zinc per month. It stated that $26,650 of cash investments had been invested in exploration and development, with further expected investments of $14,000 for mine and mill machinery and equipment.
22. It appears that the plaintiff acquired on August 7,1945, a lease from the Valle Mining Company on 5,155.36 acres of land in Jefferson and St. Francois Counties, Missouri, on which it became obligated to pay a royalty of 5 percent of the gross proceeds of its mining production. This lease was not filed in evidence, but the release thereof was executed *669 January 17, 1948, and it includes the same 560 acres of land which had been acquired from the partnership October 5, 1944.
The plaintiff obtained a new lease from the Valle Mining Company on May 1, 1947, on the same 5,155.36 acres of land which was assigned and transferred by it to the Frederick-town Lead Company January 17, 1948. The original lease of May 1,1947, was not furnished in evidence. Neither was the rate of royalty stipulated therein. The plaintiff had discontinued operations on January 31, 1947, and the Premium Price Plan for the payment of subsidies was to terminate June 30, 1947, so that the acquisition of a new lease on May 1, 1947, was for the purpose of assignment to the new operator who obtained an option on plaintiff’s assets at that time.
23. In response to a request for additional data the plaintiff wrote the Quota Committee on September 13, 1945, and submitted an operating statement for the period July through October 1943 showing an operating profit before depreciation of $19,123.15 and a similar profit for the fiscal year ended October 31, 1944, of $21,544.56. The statement for the period ended October 31, 1943, showed ore bonus of $22,504.95, as compared with ore sales of $23,719.95, and for the year ended October 31, 1944, ore bonus of $58,689.91 as compared with ore sales of $48,562.66.
There was also submitted a monthly statement of operations for the months of November 1944 through July 1945 showing an aggregate operating loss before depreciation of $20,637.96. This statement reported only 19,792 tons of rock milled with sales of $13,702.06, or 69 cents per ton, and ore bonus of $14,715.98, or 75 cents a ton for material milled.
The plaintiff had shipped 828 tons of concentrates during this 9 months’ period. Although the mill was shut down for the 3 months’ period of March-May 1945 the monthly shipments of concentrates had averaged only 138 tons on a 6 months’ basis.
By way of explaining the substantial loss during the 9 months’ period ended July 31, 1945, the plaintiff wrote the Quota Committee that operations were commenced in June 1943, after having purchased and moved a tiff mill to the *670 site, but that by March 1945 the plant was in such poor condition it would not produce a marketable quality of mixed lead and zinc concentrate (30 percent or more of metal content) and it became necessary to overhaul and remodel the mill which would permit the production of both lead and zinc concentrates with a higher grade of zinc. It was also pointed out that the dumps milled prior to November 1944 contained a richer metal content, whereas materials milled since then contained a large percentage of clay which retains part of the zinc and is not recoverable by the type of mill employed. Also the mining operations were farther removed from the mill which added to the trucking costs.
The mill was located along a spring-fed creek, with adequate water for its operation, but it was approximately 3 miles from the mining dump area, where a deep well was located. Consideration was given to moving the mill to the dump area, also to the installation of a log washer at the dumps to wash out the clay content and reduce hauling costs, as some of the material was approximately 70 percent clay. These measures were never taken.
24. The Quota Committee analyzed and considered all of the data submitted by the plaintiff as well as the assay reports of the smelting company where concentrates were delivered and sold and made certain pertinent findings on plaintiff’s projected production with its remodeled mill, as follows:
(a) The plaintiff’s operating statement reported 3,245 tons of crude ore milled in July 1945 and shipments of 20.96 tons of lead concentrates of 76 percent lead metal and 120.7 tons of mixed concentrates of 6 percent lead and 29 percent zinc metal, or a total of 141.66 tons of concentrates. This was less than one-half of plaintiff’s projected estimated production. The July operations reflected a ratio of 22.8 tons of crude ore to 1 ton of concentrates produced. Thus, it was determined that the plaintiff’s estimated production of 360 tons of concentrates per month would require milling of 8,200 tons of crude ore per month in future production.
(b) It was also found that the assay of metal indicated approximately .7 percent lead and a little over 1 percent zinc on the crude ore basis from July 1945 operations, as com *671 pared with plaintiff’s reported ore of 1 percent lead and 5 percent zinc. The committee report states: “Either the zinc content of the ore has been badly over-estimated or the mill extraction on this metal is very low — probably both.” But the committee used the low ratio of plaintiff’s July 1945 operations in determining the premium price allowances on net metal production.
(c) July 1945 mill sales reported at $3,421.43 amounted to $1.05 per ton of crude ore milled,- and premium payments of $2,908.92 represented 90 cents per ton of such ore.
(d) July 1945 operating costs reported at $5,686.75 were equivalent to $1.75 per ton of crude ore milled. It was also determined that for the 4 months’ period of November 1944 through February 1945 before the mill was shut down for overhauling, the operating costs were $25,696.83, with production of 15,752 tons of crude ore milled, equivalent to $1.63 per ton. The committee allowed the higher operating cost figure of $1.75 per ton for estimated future operations, even though this was based upon 3,245 tons milled, whereas plaintiff’s production expectancy was more than double this quantity.
(e) The plaintiff reported cash investment of $26,650 for exploration and development in its application for a revision of premium payments. The Quota Committee determined that since the low-grade ore would have no post-premium value, this cost should be amortized during the year that the Premium Price Plan was in effect and, on the basis of production expectancy, allowed an amortization expense of 27 cents per ton of crude ore, as an additional element of operating cost.
The plaintiff produced no evidence that it had, in fact, expended $26,650 for exploration and development work at the Valle mine dumps or any sum whatever for this purpose. The depreciation allowance for its mine and mill equipment was provided and included in a “margin” allowance to cover this and other items. The plaintiff knew this and made no claim for any depreciation allowance in its operating statements submitted to the Quota Committee.
(f) The committee allowed the standard margin of 35 cents per ton of crude ore production, which was applicable *672 to operators producing 5,000 tons or more per month. The plaintiff’s later production averaged less than 5,000 tons per month, so that it might have been entitled to a 10-percent increase over the standard margin had its production expectancy been properly estimated and reported to the Quota Committee.
The Quota Committee found that the plaintiff should be allowed premium payments of $1.32 a ton on future production of crude ore produced and milled and recommended as follows:

On the basis of plaintiff’s production expectancy, the Quota Committee determined that plaintiff should be allowed premium payments on its lead production over “A” and “B” zero quotas, and on its zinc production on the “A” zero quota and on a “B” quota in excess of 70 tons per month of basic production.
The committee’s determination was fair and reasonable, except for the allowance of 27 cents a ton as amortization of exploration and development costs which were never made nor incurred by the plaintiff.
25. On October 9, 1945, the Quota Committee’s analyses were prepared by W. R. Griswold and signed by Landon F. Strobel, who was the executive secretary. It recommended that the plaintiff’s production quota requirements be revised, effective July 1,1945.
By letter of October 22,1945, the plaintiff was advised of its quota revision, in part as follows:
Effective February 1,1942 the Valles Mine Dumps are assigned an initial quota of

*673 Effective July 1, 1945, the quota on metals produced from the Valles Mine Dumps are revised as follows—

with deficits cancelled as of August 1 and September 1, 1945.
*****
Kindly let us have your reports for the month of August and also for the month of September as soon as convenient. It is further requested that you furnish your reports in the future within four weeks after the close of the last month covered by the report. Kindly adhere to this schedule in the future.
The plaintiff was paid premiums on 100 percent of its lead production of concentrates (net metal of 95 percent) effective February 1, 1942, at 2.75 cents a pound under its initial quota and beginning July 1,1945, at 5.5 cents a pound (2.75 on “A” quota, plus 2.75 on “B” quota), until June 1946 when the OPA ceiling price was increased by 1.75 cents a pound and the “A” premium was reduced proportionately and continued thereafter until about November 1,1946, when premiums were paid under directive 137. It was paid 2.75 cents a pound on its “A” quota for zinc production in concentrates (net metal of 90 percent) throughout the period until October 14,1946, when it was reduced 1 cent a pound by reason of an increase in the OPA ceiling price and continuing until about November 1,1946, when premiums were paid for the difference in its assigned price and existing market.
The plaintiff did not benefit by its “B” quota for zinc production under the Premium Price Plan regulations because it failed to meet the “B” quota basic production of 70 tons a month, except for the months of April and November 1946 and previous deficits precluded any payment for these months.
26. Thereafter, the Quota Committee received a schedule of income and expense before depreciation of plaintiff’s operations for the months of July through October 1945, summarized as follows:

*674

It is obvious from the above monthly statements that they were not adjusted for inventories and income received for the months in which production occurred. However, for the 4 months combined, the average operating cost per ton of crude ore milled is $1.51, as compared with $1.75 allowed by the Quota Committee, plus 27 cents for amortization of exploration and development costs. Also, the production of concentrates was shown at 69.101 tons of lead and 542.926 tons of zinc and lead mixed, or a total of 612.027, representing a ratio of 1 to 23.4 tons of ore milled, whereas the Quota Committee determined concentrates production of 1 to 22.8 tons of ore milled.
The July 1945 operating figures upon which the Quota Committee made its determination showed an operating profit for the month of $643.60, whereas the unadjusted figures above reflect a loss of $1,227.67.
The record fails to show that plaintiff furnished any additional operating statements to the Quota Committee after October 1945.
27. On May 28, 1946, Landon F. Strobel, executive secretary of the Quota Committee, wrote plaintiff:
In reviewing your account we find that we have not received your operating reports for the period November, 1945 through to April, 1946 inclusive. You are therefore requested to submit these reports as soon as possible.
You are requested to submit monthly reports regularly, in the thirty days following the reported period.
*675 Later requests were made for plaintiff’s monthly operating statements from November 1945 by letters of the Quota Committee of July 17,1946, and September 4,1946.
On September 25, 1946, Daniel E. Lee wrote the Quota Committee that he anticipated taking over the plaintiff corporation sometime in the future but would advise further as the name would be changed.
28. On or about December 5,1946, the Civilian Production Administration issued a notice to all producers that the quota assignments had been changed, effective November 1, 1946, to a one-price base assignment by a simple conversion of existing quotas. This notice pointed out that it in no way altered the procedure of applying for premium revisions, and that the committee would review any case and recommend a revision if warranted, which was limited to maximum assignments of 14.75 cents a pound for lead and 16.5 cents a pound for zinc.
The revision of plaintiff’s quota assignments existing October 31,1946, resulted in assigned prices of 12 cents a pound for lead and 11.3 cents a pound for zinc, as follows:

The market price for lead exceeded the plaintiff’s assigned price of 12 cents a pound in J anuary 1947 and the market for zinc was 10.50 cents, so that the market and assigned prices were substantially equal. The plaintiff discontinued operations by the end of J anuary 1947.
29. On November 30,1946, the plaintiff, by Daniel E. Lee, had sent the committee the following telegram:
*676 PLEASE FORWARD REQUIRED PAPERS TO EFFECT ADJUSTMENTS ON ZINC AND LEAD QUOTAS ON PRODUCTION FROM VALLES MINES DUMPS. WILL HAVE TO SHUT DOWN UNLESS QUOTAS ARE INCREASED.
On December 5,1946, the Quota Committee wrote plaintiff:
Your telegram of November 30? 1946, requesting the necessary papers for a quota revision, has been received.
In view of the fact that we have received no reply from our letters of July 15, 1946 and August 80, 1946, both of which requested the monthly operating reports of the Valles Mine Dumps from November 1, 1945 forward, we will be unable to consider your application for a quota revision until you have furnished us with the monthly operating reports of the above mine for the period from November 1,1945 to November 1,1946 and a forecast of operations for the near future. Your forecast should contain the estimated net smelter returns, operating costs, grade of ore, and anticipated tonnage of ore.
We are enclosing a copy of Form 2465 for your use.
On March 12, 1947, the committee wrote the plaintiff, as follows:
With further reference to your telegram received November 30,1946 our letter of December 5,1946, and your reply dated January 25, 1947, it appears that you have not forwarded the reports requested covering the Valles Mine Dumps from November 1945 forward.
Since the information requested is necessary before consideration can be given to your quota, by your neglect to furnish same, we cannot act and must assume that you do not intend to pursue the matter. Accordingly, your case is being removed from our Agenda.
29. On September 26,1949, the plaintiff, by Daniel B. Lee, wrote the Metals Eeserve Company, the War Production Board and the Office of Contract Settlement, that the plaintiff had a claim under section 17a of the Contract Settlement Act of 1944 as a result of its mining operations during the period of World War II and that despite the premiums received the company sustained a loss as a result of such mining operations. Each of these agencies replied to plaintiff and plaintiff was furnished a copy of regulation 12 of the Office of Contract Settlement which set forth the procedures for *677 the preparation of any claim under section 17 of the Contract Settlement Act of 1944.
The plaintiff took no further action on these alleged claims.
30. Leslie H. McColgin was field representative of the Metals Reserve Company and RFC during the period 1942 to 1947, when the Premium Price Plan was in operation. He maintained offices at Joplin, Missouri, and was available for consultation and advice to producers. The plan was published in the local papers and operators were furnished the rules and regulations for its administration. He discussed the plan with George Moore, plaintiff’s first president, and had a conference with Smoot and Ferneau one evening. There is no question but that plaintiff’s officials were adequately familiar with the plan, its operations and the rights and benefits provided.
PRODUCTION AND COSTS
31. The plaintiff claimed production of concentrates contained 693,562 pounds of lead and 1,910,003 pounds of zinc for the period October 1944 through January 1947. The plaintiff did not operate the dumps during October 1944 but the partnership continued such operations until the end of October and collected the proceeds of sales and premium payments.
The plaintiff’s report of its milling operations for the month of October 1944 reflected a loss of $29.45. The report of the partnership operation of the mining dumps reflected a loss, after premium receipts, of $2,355.48 for the month of October 1944. The plaintiff concedes that October 1944 costs to the partnership were overstated by $1,868.21.
The plaintiff’s unadjusted production record for the period from November 1, 1944 to January 31, 1947, is summarized in table I herein. The production for the fiscal year ended October 31, 1945, is segregated for the period beginning July 1945 after the mill had been renovated for the production of a better grade of concentrates.
32. The production of crude material was estimated by the mill superintendent on the number of truckloads delivered to *678 tbe mill. The daily reports of deliveries covering the period from August 1944 through December 1946 were received in evidence as plaintiff’s exhibits 15A and 15B. The average truckload was estimated at 3.54 tons during the period of August 1944 through February 1945. When operations were resumed in the latter part of June 1945 the estimate was increased to 5 tons a truckload for all of the remaining period.
On the basis of these estimates the plaintiff reported that it had milled 88,168.36 tons of crude material, including 4,050.87 tons milled in October 1944. The metal content of the crude ore, by the assay of the concentrates shipped to the smelter, represented 2.26 percent from October 1944 operations and 2.43 percent for the period November 1944 to June 1945, but only averaged approximately 1.25 percent from July 1945 as shown in table I herein. The ratio of concentrates produced was similarly reduced. It is obvious that the estimate of 5 tons per truckload was excessive. Had the estimates continued at 3.54 tons per truckload, the quantity of crude material milled would represent approximately 65,000 tons, including October 1944 production. The plaintiff’s production and milling of crude ore appears to be overestimated by approximately one-third.
33. The plaintiff’s statements of operating the Yalle mine dumps and the milling of concentrates for the period November 1,1944 to January 31,1947, are set forth in table II herein, showing a net loss of $18,408.25. This loss fell entirely within the fiscal year ended October 31,1945. During the months of March through June 1945 there were charges to operations of $17,672.42, whereas only an estimated 890 tons of material were hauled from the dumps and only 795 tons were milled commencing in the latter part of June 1945. Also, in February 1945 the plaintiff’s report to the Quota Committee showed total costs of $7,924.66, whereas it had milled only 1,674 tons of crude materials. There is no evidence that any part of these charges were capitalized for overhauling the concentration mill. The Premium Price Plan regulations precluded allowances of premium payments to cover prior losses.

*679

*680

Considering plaintiff’s own estimates of crude ore milled, its operating costs for the entire period averaged $1.44 per ton ($121,390.25 84,117.49) ,.as compared with the allowance by the Quota Committee of $1.75. Its depreciation and other nonoperating expense averaged 34 cents per ton ($28,752.97 -r-84,117.49), as compared with the committee’s standard margin allowance of 35 cents a ton. In addition the Quota Committee allowed 27 cents a ton for amortization of $26,650 of exploration and development costs, for which the plaintiff has failed to show any proof of expenditures.
34. Prior tests of the Valle mine dumps showed that the material contained approximately 2.5 percent lead and 1.48 percent zinc. The plaintiff’s milling of concentrates produced only .39 percent lead and 1.05 percent zinc on its overall production in table I herein. As the OPA price was *681 increased, during 1946, the premium price was correspondingly reduced and, by November 1946 when a free market was established, the premium payments on plaintiff’s assigned prices were largely eliminated. The plaintiff’s receipts from ore sales were based upon the smelter’s price and assay of its concentrates, whereas the premium prices were based upon the net production of metal.
The plaintiff’s low recovery of metal resulted in reduced income both in the sale of concentrates and the premium payments on the net metal produced.
The regulations of the Premium Price Plan provided that “in the calculation of quotas, higher operating margins per pound of metal are reckoned for those mines which produce metal at lower costs per pound.” The plaintiff’s estimated costs and production of lead and zinc would not justify additional premium payments under the regulations of the Premium Price Plan.
35. The defendant contends that plaintiff’s overall net loss should be reduced and offset by the net profit of $7,008.76 for the fiscal year ended October 31,1944, as reported in its income tax return. This return shows that plaintiff was incorporated October 16, 1943, and commenced business in November 1943. Its operating costs included depreciation on its mill and equipment of $11,405.28 and on trucks and equipment of $1,925.58, commencing December 1, 1943, but its business was reported as “contract milling.” Premium payments were applicable to mining operations only.
36. The operating statements furnished the Quota Committee by the plaintiff in September 1945 for prior periods appear to cover both mining and milling, since they contain no item for milling costs, but do include the various items of expense in mining and milling of the crude material. The operating profit before depreciation for the 4 months ended October 31, 1943, of $19,123.15 was after royalty charges of $8,150.13 and the operating profit before depreciation for the fiscal year ended October 31, 1944, was $21,544.56 after royalty charges of $14,433.25. The value mine dumps were operated profitably under the initial quotas for both of these periods. Factors that contributed to the loss in operations *682 during the later period are reported in the following findings of this report.
37. Mining of the dumps was substantially reduced during the winter months. The shovel at the dumps was down January 28 to February 2,1945, waiting for parts. It broke down again on February 16, 1945, and no material was delivered to the mill from that time until June 19,1945. Mining at the dumps was closed December 18, 1945, by reason of heavy snow and cold weather and it was not resumed until February 4,1946.
There were no milling operations performed from early March until late June 1945, reportedly, “due to financial difficulties.” However, during this period the mill was being overhauled. Neither was there any production of concentrates during March 1946.
The plaintiff concedes that the costs incurred during months when there was no production should be deleted in the determination of unit costs of material processed.
38. The mill was located approximately 3 miles from the dumps. As the removal of the surface material continued, the hauling distance to the mill was increased. In October 1944 the plaintiff subcontracted hauling to Thomas Dodson at 65 cents a ton. During February 1945 the plaintiff’s superintendent estimated some loads at only 2 to 2.5 tons, due to the condition of the roads. However, beginning in late June 1945 until November 1946, when the plaintiff acquired a scale, hauling was estimated at 5 tons per truckload.
Most of the material was hauled under contract with truckers. There is no satisfactory evidence of the proportion of materials hauled by truck contractors and the quantity hauled by the plaintiff’s own trucks. During the period from November 1944 to J anuary 1947 the plaintiff paid contract haulers $30,474.08, or an average of 36 cents a ton, on the overall estimated tonnage of crude material processed.
Some of the material contained as much as 70 percent clay that would be wasted in the production of concentrates. The plaintiff’s superintendent recommended the construction of equipment at the site, known as a “log washer,” for use in eliminating the mud from the ore, but this was never installed because of the additional cost. It would have reduced the *683 hauling costs substantially. A reasonable cost of hauling materials over a 3-mile distance would be approximately 50 cents a ton. Such costs could have been substantially reduced by the elimination of waste material at the dumps or by locating the mill at the site.
39. George Moore was president of the plaintiff corporation until about October 1945 when Daniel R. Lee became president and continued thereafter. Jack Ferneau was designated vice president and manager and E. R. Smoot was secretary-treasurer, although George Little, of the accounting firm Sinderson, Little and LaShell which kept plaintiff’s books, was secretary for about 1% or 2 years.
The plaintiff’s business was operated under a superintendent and no one stockholder or official. exercised any immediate supervision or control over it, or even resided in the vicinity. The superintendent was designated a salary of $300 per month, Smoot $75 a month and Ferneau $50 a month, but they were not regularly paid.
Moore was in the insurance business in Joplin, Missouri, and the chairman of the board of the Republic National Life Insurance Company and its predecessor company until his death. He was also an ore buyer and mine operator. Smoot was also in the insurance business and Ferneau was in the mining and ore buying business. Both had offices in Joplin, Missouri, but are now deceased.
Lee gave his full time to the insurance business with the Republic National Life Insurance Company, which started in Joplin, Missouri. He had no mining experience and was at the mill only when it was being erected in 1943. He never knew what the plaintiff realized upon its concentrates produced, the premium prices received or the condition of the mill and equipment. Lee never did examine the books of the company, but did see 30- or 90-day reports.
Theo. P. Beasley was in the insurance business in Dallas, Texas, and took no active part in plaintiff’s mining operations, but visited the mine once and attended one or two meetings. It is reasonable to conclude that the lack of experienced supervision contributed to the low production and high cost of plaintiff’s operations.
*684 40. Gerald Klepinger supervised the mining and milling operations from September 1944 until the spring of 1945. J. A. Worley was employed as superintendent in March 1945 and continued until operations were terminated in January 1947. Worley was the more experienced mill operator and supervised the milling and Klepinger continued to look after the dumps and trucking operations until about January 1946.
Worley was hired by Lee and fixed up his employment papers in Moore’s office. The superintendents operated the mine and mill largely on their own. There was no one official in charge. Both Smoot and Ferneau made trips to the mill. Daily reports of production or nonproduction were submitted to Smoot, Ferneau or George Little. They experienced difficulties in keeping equipment in repair and paying bills, and such matters were usually taken up with Smoot or Ferneau by telephone or correspondence to Joplin.
On January 24, 1945, Klepinger wrote Ferneau: “I have no bank account but am writing checks which they are holding for me. The trouble is now they are wanting their money.” And again on March 8, 1945, Klepinger wrote Ferneau: “I know the company is without funds and * * * in a bad situation but something must be done before legal action is taken.”
On March 24,1945, Klepinger wrote Ferneau: “Jess, Ellis and a carpenter came down last evening and today we are tearing things out such as crusher, hopper and rolls. This remolding [remodeling] will cost quite a bit but will sure increase the efficiency of the mill.”
41. On July 27,1945, Klepinger wrote Smoot, “Guess Jess will be down soon to talk to you men about different arrangements here for milling”, and then added the following postscript:
Could one of you men come down here for a few days and see what we have here now in the way of dumps. Also see one of the tiff mills operate and see how they handle twice the tonnage that we do with half the mill, by using a double SO' log washer. We can not operate this way and pay off the debts as it is too slow and we do not have that much dirt left. The rich dumps are gone and now we have to run tonnage to make enough *685 ore to make the operation pay. To run tonnage we have to get rid of the mud and 214" rock and over out at the dumps.
The reference to “Jess” refers to J. A. Worley who commenced work in March 1945 as the superintendent of the mill. He remodeled the mill and instituted an operation for producing a separate lead concentrate as well as the mixed concentrate of lead and zinc. The concentrates thereafter produced contained a higher assay of metal, but the ratio of concentrates to crude material milled was substantially less than for prior operations, due in part to a lower grade of crude ore milled but due also to an overestimate of tonnage milled.
It is reasonable to conclude that the poor facilities and inadequate financing contributed substantially to the high cost and low production ratio in plaintiff’s operations.
42. By the end of July 1945 the plaintiff’s indebtedness totaled $32,612.27, including stockholders’ loans of $4,000, secured balance of $2,625 to L. R. Reynolds on the shovel and bulldozer, and $6,000 to Caresio and Lee on the mill and truck, royalties due Lemons, Hatcher, et dl., for $5,952.64 and to Lee and Oesterle of $155.67, accrued salary to Worley of $1,500, payroll taxes of $599.62, withholding taxes of $735.14 and income taxes of $895.50.
On August 14,1945, E. R. Smoot notified the other directors of a meeting called for August 17 for the prime purpose of raising $11,000. The letter to Theo. P. Beasley, Dallas, Texas, states in part:
You will note from copy of notice to Dan of Directors Meeting of the 17th for the purpose stated. The people whom we are owing, are making so much trouble it is absolutely necessary for us to raise money to pay at least a part, or else. It is quite evident that the other deal which we had in mind has fallen through, for what reason, I do not know. Mr. Worley has been here for several days and has sold us on the idea of the installation of a logwasher in the dumps and a hopper in which the [to] put the milling ore which shall have been relieved of the mud which is causing so much trouble. This would greatly cheapen the trucking bill and would afford a much richer product to be milled.
*686 We have also been very busy getting up data to be sent in to Metals Reserve, Washington, to apply for “C” Bonus on zinc concentrates and “B” on lead. From good opinions we have, we feel that we can reasonably expect to get at least one bonus which would add at least $30.00 per ton to our present average price of about $30.00.
There is no satisfactory evidence of the cash raised by the directors, if any, but the log washer was never installed.
DISPOSITION OP ASSETS
43. Following the termination of its mining and milling operations in January 1947 but before April 11, 1947, the plaintiff received a written proposal from the Frederick-town Lead Company for an option to purchase its mining and milling equipment and property for the sum of $35,000, subject to a mortgage of $6,000. At a special meeting of the stockholders April 11,1947, this proposal was accepted and the officers and directors were authorized to prepare the option contract and conveyance in the event that the option was exercised by the Fredericktown Lead Company.
On the same day the directors of DeSoto Lead and Zinc Company authorized the officers to execute a new note to Lee and Caresio for $6,000[3] carrying a rate of 5 percent and a new mortgage securing the same covering all of plaintiff’s property, including a new lease from Valle Mining Company covering all of its acreage, also a 6 months’ promissory note to Lee and Caresio bearing a rate of 5 percent to cover the unpaid interest on the old mortgage note. The officers of plaintiff were further authorized to release to Valle Mining Company the two leases then held upon the execution of a new lease covering all of its lands in Jefferson and St. Francois Counties, Missouri.
On April 7, 1947, Ralph and Orville Hatcher released to plaintiff their interest in a mining lease in the Valle Mining Company dumps.
44. On May 1,1947, an option agreement was executed by Daniel R. Lee, president, for plaintiff and Ewart L. Petley, *687 vice president and general manager, for the Fredericktown Lead Company. This option agreement was for a period of 6 months and provided for the purchase of all of plaintiff’s property for $35,000, subject to the mortgage of $6,000 and was payable at $7,500 within the 6 months’ period, $5,000 installments for 5 periods of 60 days each and $2,500 within 60 days after the last $5,000 installment. It specifically provided for the assignment of a lease by Valle Mining Company to plaintiff dated May 1,1947, covering approximately 5,155 acres of land in Jefferson and St. Francois Counties, Missouri, with the right to enter upon the lands and conduct the mining and milling operations during the option period, but in the event that the said option was not exercised the profits on such operations were to be paid over to the plaintiff.
This option was extended to January 17, 1948, when a purchase agreement was executed, as hereinafter reported. On May 19, 1947, the plaintiff notified the director of the Premium Price Plan that the Fredericktown Lead Company had assumed operations of the Valle Mining Company dumps effective May 1, 1947, and authorized the transfer of the production from these dumps to it. On May 21,1947, Fred-ericktown Lead Company applied for the maximum premium on zinc production from the Valle mine dumps. There is no evidence of what premiums were received by Fredericktown Lead Company or whether plaintiff profited thereby, nor is there evidence of anything being paid to plaintiff by Fred-ericktown from operations during the months when it operated plaintiff’s equipment and under plaintiff’s lease.
45. During the option period as extended the Frederick-town Lead Company paid to plaintiff the $7,500 in contemplation of the purchase of the assets. Payment of $5,000 was made on or about December 30, 1947, and $2,500 about January 3, 1948. Daniel B.. Lee then purchased all of the remaining 700 shares of outstanding stock at $6.25 a share December 30, 1947, and acquired Caresio’s one-half interest in the $6,000 mortgage, which had been reduced to $3,500 on or about October 31,1946, as noted in the footnote to finding 43. Lee said that he acquired all of the plaintiff’s outstanding stock because of disagreement among stockholders on the price of the sale of its assets and property.
*688 On January 17, 1948, the plaintiff by Daniel R. Lee, its president, executed a bill of sale whereby plaintiff’s mining and mill equipment was transferred to Fredericktown Lead Company, “for value received,” together with the assignment of the lease of approximately 5,155 acres of Valle Mining Company lands. The plaintiff executed a receipt on the same day for the $7,500 payment, representing part payment of the purchase price of $20,000.[4]
On the same day Fredericktown Lead Company executed a mortgage on the property and lease to plaintiff to secure a note of $12,500, payable at $500 a month beginning May 1, 1948. Fredericktown Lead Company also executed a royalty assignment on January 17, 1948, to Daniel R. Lee personally, whereby Lee would receive 1 percent of the gross proceeds of sales of metal concentrates produced from the leased land for a period of 2 years and 2 percent of such gross proceeds for an additional 3 years and so long thereafter as Fredericktown Lead Company or its successors produced concentrates from such lands, or until the death of Lee, but in event of death before 5 years, then such payments would continue until the end of 5 years. There is no satisfactory evidence of the value of this royalty assignment.
On January 17, 1948, Lee transferred 100 shares of stock in plaintiff corporation to his wife, Bertha G. Lee and 1 share to Gaylord Goodwin, which share was transferred to Claude Slaney of Fredericktown Lead Company on May 2, 1948. There was no increase in the 2,200 shares outstanding.
46. The book value of plaintiff’s equipment is reported at $46,667.29 at the close of the fiscal year ended October 31, 1947, with prepaid insurance thereon of $731.45. Depreciation thereon was $36,759.95 represented by an evaluation reserve account balance. The net book value, plus prepaid insurance on the same, was $10,638.79. The sale of this equipment to Fredericktown Lead Company resulted in a net profit thereon of $9,361.21. In addition, the plaintiff had sold a truck during the period of operation from November 1,1946 to January 31,1947, at a net profit of $355. The *689 plaintiff’s income from the sale of its assets amounted to $9,716.21.
The plaintiff claims that its profit on the sale of its mill and equipment should be reduced by $8,000 as the value of its “milling contract.” Of course, the milling contract that plaintiff had with the partnership was eliminated when the mining and milling operations were merged in October 1944. There is no evidence that plaintiff paid anything for its milling contract.
The plaintiff’s testimony is that the $8,000 entered upon its books as an evaluation of its milling contract was actually the mining sublease which required a royalty payment to Lemons and Hatcher and others but was reportedly eliminated in August 1945 when plaintiff acquired a new lease directly from the Valle Mining Company.
47. Daniel E. Lee had acquired from Lemons and others a %6 interest in the Lemons and Hatcher lease of 560 acres acquired from the Valle Mining Company July 1,1940, and assigned these interests to the DeSoto Lead and Zinc Company November 10, 1945. He was paid $2,800 for these interests by the plaintiff on November 28, 1945, which was exactly what they had cost him. The remaining interests held by Ealph and Orville Hatcher were assigned and released July 5, 1947, to Daniel E. Lee for $1,500, wherein the DeSoto Lead and Zinc Company was also discharged from any obligation in operating the lease. Lee was refunded one-half of the cost of the Hatcher interests by the payment of $750 by the Fredericktown Lead Company for a one-half interest in this assignment.
Since the plaintiff was relieved of any further payment of royalties on the %6 interest in this lease purchased by it in 1945, it is reasonable to conclude that the payment of $2,800 was charged to its operating expense. However, there is no satisfactory evidence of how this payment was treated on its books. In any event it would have had no substantial value on January 17, 1948, when the sale was consummated, since the operations of the Valle mine dumps no longer carried any premium price subsidy payments for metal produced.
*690 INVESTED INTERESTS OF DANIEL R. LEE
48. Pursuant to rule 28 the plaintiff submitted schedules of investment and payments by Daniel E. Lee in and for the account of DeSoto Lead and Zinc Company, showing net investments of $15,881.52 after receipts from the corporation and the collections on the sale of its assets by him.
The evidence shows that Daniel E. Lee has recovered a surplus of at least $5,000 over and above all investments in the plaintiff corporation, as well as advances to and losses by the partnership operation of the Valle mine dumps and the cost of acquiring outstanding stock, the settlement of claims and acquiring a one-half interest in the Ealph and Orville Hatcher lease after plaintiff ceased operations.
49. The defendant paid out under the Premium Price Plan $351,108,139 over the entire period of its operations from February 1, 1942 to June 30, 1947. Initial quotas were assigned to 4,174 mine operators but 583. did not report any production and did not receive any premiums. The 3,591 that participated in production were paid an average of $97,774 over the entire period. The plaintiff was paid $64,-062.70 in premiums for the operation of the Valle mine dumps for that portion of the period from November 1,1944 to January 31,1947 (table II). But premiums of $81,194.86 were paid to the partnership for operating these dumps for the period July 1,1943 to October 31,1944.
On a unit production of metal, the overall average of premium price payments was 3.41 cents a pound for lead on 42.15 percent of domestic production and 4.067 cents a pound for zinc on 57.61 percent of domestic production.
The premium price paid to the plaintiff on its production from November 1, 1944 to January 31, 1947, was approximately 4.06 cents, a pound for lead on 90 percent of its production, equivalent to 8.67 cents a pound on 42.15 percent thereof, and 2.53 cents a pound for zinc on 95 percent of its production, equivalent to 4.20 cents a pound on 57.16 percent thereof.
Premium price payments to the plaintiff not only exceeded the average payments to all other producers but the unit price on metal produced also exceeded the unit prices to other *691 producers on the proportion of production on which payments were made.
50. The plaintiff corporation sustained a loss of approximately $18,408.25 during the period it operated the Valle mine dumps, but realized a profit of $9,716.21 on the sale of its assets after operations ceased.
The plaintiff’s losses resulted from costs and charges when the mining operations were closed, amounting to $17,672.42 for the months March through June 1945, excessive hauling costs, lack of supervision, inadequate financing and inefficient mill and equipment.
Daniel R. Lee, who owns all of the capital stock of the plaintiff corporation, benefited personally through plaintiff’s operations and the liquidation of its assets to the extent of at least $5,000.
Under the rules and regulations for the operation of the Premium Price Plan the plaintiff could not be properly awarded additional premium payments on its mining operations.
The plaintiff’s receipts of premium payments exceeded the proceeds of sales of its concentrates produced prior to November 1,1946, when a free market was reestablished (table II). The premium payments received by the plaintiff were equal to or better than the average for other domestic producers.

 The Emergency Price Control Act of 1942 provided for its termination, and all regulations for its administration, by June 30, 1943. It was extended to June 30, 1944, by the act of October 2, 1942 (56 Stat. 765, 767), and further extended to June 30, 1945, by the act of June 30, 1944 (58 Stat. 632). It was extended to June 30, 1946, by the act of June 30, 1945 (59 Stat. 306), and the act of June 23, 1945 (59 Stat. 260, 261), specifically extended the Premium Price Plan on copper, lead and zinc “on the same terms as heretofore, *645 except all classes of premiums shall be noncancellable unless necessary In order to make Individual adjustments of Income to specific mines.” It was finally extended to June 30, 1947, by the act of July 25, 1946 (60 Stat. 664, 671), but limited the loss on sales andi subsidy payments on copper, lead and zinc for the year to $100,000,000.
Section 2 (e) of the Emergency Price Control Act of 1942 provided in part:
“Whenever the Administrator determines that the maximum necessary production of any commodity is not being obtained or may not bo obtained during the ensuing year, he may, on behalf of the united States, without regard to the provisions of law requiring competitive bidding, buy or sell at public or private sale, or store or use, such commodity in such quantities and in such manner and upon such terms and conditions as he determines to be necessary to obtain the maximum necessary production thereof or otherwise to supply the demand therefor, or make subsidy payments to domestic producers of such commodity in such amounts and in such manner and upon such terms and conditions as he determines to be necessary to obtain the maximum necessary production thereof: Provided, That in the case of any commodity which has heretofore or may hereafter be'defined as a strategic or critical material by the President pursuant to section 5d of the Reconstruction Finance Corporation Act, as amended, such determinations shall be made by the Federal Loan Administrator, with the approval of the President, and, notwithstanding any other provision of this Act or of any existing law, such commodity may be bought or sold, or stored or used, and such subsidy payments to domestic producers thereof may be paid, only by corporations created or organized pursuant to such section 5d; * * *”

 The balance of 1,000 shares was Treasury stock.

 The plaintiff’s financial statements show that Its book record of liability on the chattel mortgage note to Lee andi Caresio, originally for $6,000, had been reduced to $3,500 by October 31, 1946.

 There is no satisfactory evidence or explanation for the reduction in the sale price of plaintiff's property to Fredericktown Lead Company from the proposed price set forth in the option agreement.